ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| K&K Industries, Inc. ) | ASBCA No. 61189 |
| ) | |
| Under Contract No. W912HY-11-C-0009 ) | |

APPEARANCES FOR THE APPELLANT:  Terrence Brennan, Esq.
Brian S. Schaps, Esq.
  Deutsch Kerrigan, L.L.P.
  New Orleans, LA

APPEARANCES FOR THE GOVERNMENT:  Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
Clark Bartee, Esq.
James Purcell, Esq.
P. Alex Petty, Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, Galveston

OPINION BY ADMINISTRATIVE JUDGE PEACOCK

This appeal, brought by K&K Industries, Inc. (K&K), challenges the government's failure to pay it the full amount claimed as a result of delays incurred performing the above-captioned contract (the contract) that were admittedly the government's responsibility. We sustain the appeal.

FINDINGS OF FACT

1. The government awarded the contract in the amount of $5,648,573.58 to K&K for rehabilitation of the east and west floodgates and guidewalls for the Brazos River floodgates in the Gulf Intracoastal Waterway, Texas. Through modifications and amendments the contract price was adjusted upward to $9,689,562.92.00, including the unilateral modification at issue in this appeal. (Exs. A-20, -22, -24)

2. The contract (or Project) generally involved the inspection, refurbishment, repainting and reinstallation of two sector floodgates on the west side and two sector floodgates on the east side. Each sector gate weighed approximately 88 tons when cleaned and over 120 tons before they were removed and cleaned. (Tr. 23; exs. A-20, -21)

3. K&K removed each gate, one at a time, and transported the gate to a staging area for inspection, cleaning, refurbishment, and repainting. Once that process was

completed, K&K reinstalled the gates and had to ensure the gate was fully functional before moving on to the next gate. The installation involved placing the gates into stationary castings at the top and bottom of the gates. The castings were then bolted into the wall and bottom of the canal. This work was all included in the original contract. (Tr. 22-24, 29, 31-32; ex. A-21)

4. K&K completed the work required by the contract on the west side gates and that work is not at issue in this appeal (tr. 23-24). K&K's claim specifically arises from repair work to the east gate, north sector, lower stationary hinge casting as specified under contract line item number (CLIN) 043 — "East Gate Repair Lower Stationary Hinge Castings" for the contract. The unit price for each of the two lower stationary hinge casting on the east gate was $52,933 for a total price of $105,866. (Ex. A-20 at 15-16; tr. 35-37)

5. The contract specifications for the lower stationary casting provide (ex. A-20 at 375, ¶ 3.3.3.1):

> After removal of the sector, the Contractor shall measure
> the top and bottom rings of the casting.... This will require
> the services of a diver. The Contracting Officer may direct
> the Contractor to remove the casting pending the
> measurements of the upper and lower rings. New anchor
> bolts shall be provided for the existing bolts and welded
> studs that are removed, and new key assemblies shall be
> provided where required. The Lower Stationary Hinge
> Casting shall be cleaned and painted before reinstallation.

6. K&K performed all of the work provided for in this specification for the east gate north sector lower stationary hinge casting and K&K did not make any claim for work required prior to painting (tr. 37-39).

7. K&K removed the existing east gate north sector lower stationary hinge casting. Once cleaned, K&K discovered cracks in the casting. K&K informed the government of the cracks and the government ultimately decided not to reuse the existing casting and elected instead to use a spare casting. (Tr. 39-40)

8. On June 24, 2013, K&K submitted a request for information (RFI 59) to the government, informing the government that the spare casting was cleaned, measured, and x-rayed and appeared to be fit for use as the north sector east gate. In RFI 59, K&K requested that a local machining shop perform more definitive measurements of the spare casting. The government approved the more definitive measurements be taken by the machining shop. K&K did not charge the government anything extra for these activities. (Tr. 40; ex. A-12)

2

9. On July 16, 2013, K&K submitted RFI 60 regarding the use of the spare casting in lieu of repairing and reinstalling the existing damaged casting. The RFI contained the measurements taken by the machining shop and composition testing results. All of the measurements and testing indicated that the spare casting would fit. K&K recommended the spare casting be used, and the government approved K&K's use of the spare casting. (Ex. A-11; tr. 40-43)

10. K&K cleaned and painted the spare casting at no additional charge to the government. There was no credit or deduction for the unit price of $52,933 for the repair work for the existing east gate hinge casting at issue because, before work on the spare casting began, the government and K&K agreed that the work needed to prepare and install the spare casting would be essentially the same as the repair and reinstallation of the existing casting. (Tr. 1/40-41)

11. On August 23, 2013, K&K's divers cleaned the recess area along the floor where the east gate north sector lower stationary hinge casting was to be set and began the installation of the spare casting. However, certain bolt holes were not aligned and fitted properly. (Exs. A-10, -15, -16; tr. 41-44)

12. On August 29, 2013, after several days of grinding the bolt holes and trying to make the spare casting fit, K&K submitted RFI 61 to the government, detailing the alignment problems with the spare casting's bolt holes and requesting direction from the government. The government directed K&K not to proceed until receiving instructions from the government. The government responded to the RFI on September 3, 2013, instructing K&K to proceed with the use of plate washers and machining and grinding of the casting bolt holes and providing detailed specifications/criteria for the plate washers and bolts. K&K proceeded with the work per the government's instructions. (Exs. A-15, -16; tr. 45-47)

13. On August 30, 2013, K&K submitted RFI 62 regarding cleaning of the bolt holes and installation of washers under the bolts. K&K informed the Corps that a second fit test would be required to verify that the washers would not interfere with the gate movement. The government orally approved the washers and the fit test on or about August 30, 2013, and responded to RFI 62 in writing on or about October 8, 2013, after the Project was already substantially complete. (Ex. A-9; tr. 47-48)

14. On September 13, 2013, K&K successfully set the north casting on the east gate, inserted all of the bolts, installed the washers, and tightened all of the bolts (tr. 48-49).

15. During the 21-day period from August 23, 2013 through September 13, 2013, (the delay period) during which K&K performed the work to prepare and install the spare east gate north sector lower stationary hinge casting, there was no concurrent

ongoing work which was on the critical path for the completion of the Project. The west gate complex was completely finished, including the installation of the cathodic protection. The east gate south sector was cleaned and ready to be installed, but the north and south sector had to be installed at the same time. The spare east gate north sector lower stationary hinge casting was the sole activity on the critical path of the Project during the 21-day period from August 23, 2013 through September 13, 2013. (Tr. 49-52, 63-64, 82-100; exs. A-15 at 69-71, ex. A-16)

16. Ryan Pelletier, K&K's quality control manager, who was on site every day during the period of delay, prepared quality control reports which recorded the personnel on the Project site, including their employer, trade, and hours worked, and equipment on the Project site, including operating hours and idle hours (ex. A-15; tr. 74-76).

17. Following the installation of these last two sector gates on the east side, K&K performed additional activities including the connection and testing of the cathodic protection to the east side gates, alignment of the gates, adjusting of the motors and drive, the installation of rollers, and clean-up of approximately 70 truckloads of debris, including clamshells dug out from the recess along the floor of the canal (tr. 64-66).

18. The equipment needed to perform these final activities was on site on August 23, 2013, and had to remain on site until the work for these final activities was completed (tr. 64-66, 88-89).

19. K&K had seven employees on site from August 23, 2013 through September 13, 2013. These employees were needed to assist the crane during the installation of the gates by hooking up the arms with rope and aligning the pins for the gates. (Tr. 66-67)

20. As discussed below, K&K filed a claim with the contracting officer (CO). K&K's claim, as finally revised, only includes the request for additional compensation for three K&K employees on the Project site from August 23, 2013 through September 13, 2013. These three K&K employees, John Whiskin (certified crane operator), Jesus "Manuel" Alvarez (welder), and Jashim Leger (laborer/qualified signal person and Whiskin operated the crane to lower the divers and set the casting. Setting the spare casting was the only activity involving a crane during this time period. Mr. Alvarez performed the welding and grinding of the bolt holes to help with the alignment issues. Mr. Leger rigged the casting to the crane to raise and lower it and gave signals while the divers and/or casting were lowered into the water. One hundred percent of these three employees' time on the Project from August 23, 2013 through September 13, 2013, was related to the spare casting issue, except for some minor, non-critical path

4

activities performed while waiting for the spare casting alignment issues to be resolved. (Tr. 77-80, 94; ex. A-15)

21. K&K retained Fidel Perez, a former Corps employee with over 24 years of claim experience, as a consultant to assist with K&K's requests for additional compensation and to communicate with the government related to the spare casting issue. Mr. Perez began consulting for K&K related to the spare casting issue on or about December 12, 2014. (Tr. 52-55, 101-02, 104-05; ex. A-3 at 535)

22. From December 14, 2014 to September 12, 2016, Mr. Perez incurred 284.5 hours of consulting services for K&K related to the REAs, including communications and meetings with the government. From December 14, 2014 through the filing of K&K's complaint in this appeal on June 29, 2017, Mr. Perez performed consulting services for K&K in the amount of 349.5 hours. (Exs. A-3, -7 at 648, ex. A-14; tr. 124-25) The CO accepted the rate of $200 per hour charged by Mr. Perez as K&K's consultant and approved $37,600 in fees and costs for 188 hours of services provided from December 2014 through October 27, 2015 (ex. A-1 at 516, ex. A-19 at 87; tr. 58-59, 125).

23. On January 7, 2014, K&K submitted an REA in the amount of $69,349.44 to the government for the additional expenses incurred to modify the east gate north sector lower stationary hinge casting (ex. A-1 at 511).

24. On August 7, 2014, the government responded to K&K's REA, approving only a portion of the REA, principally the charges paid to a local machine shop for machining the hinge castings (ex. A-1 at 511).

25. On May 26, 2015, K&K submitted an updated REA to the government. The equipment costs for the REA, and the later revised claims, were calculated in compliance with the U.S. Army Corps of Engineers' equipment manual. The labor costs for the REA and the later revised claims were calculated based on certified payrolls. (Tr. 105-06, 108-14; ex. A-27)

26. On January 13, 2016, K&K submitted a certified claim to the CO for the project, Maria Rodriguez, in the amount of $131,367.66 and a time extension of 22 calendar days (ex. A-1 at 511). Prior to submission of the claim, Mr. Perez expended 236 hours and, at his unchallenged rate of $200 per hour had incurred $47,200 in consulting fees on appellant's behalf (ex. A-3 at 535-57).

27. On September 12, 2016, K&K submitted a revised claim to the CO, in the amount of $150,625.86 and a request for a time extension of 21 calendar days (ex. A-7).

28. The additional labor costs for the 21-day delay requested in K&K's revised claim is $7,959.27, as verified by the certified payrolls for Messrs. Whiskin, Alvarez, and Leger, and the labor performed by those three individuals was dedicated exclusively to the work on the spare casting. The government does not dispute the labor rates. The government, in the CO's decision, reduced two employees' time spent on the spare casting based on an unsupported "guess, an estimate." (Ex. A-7 at 646, 649, 653, ex. A-19 at 37-39)

29. The additional equipment costs for the 21-day delay requested in K&K's revised claim is $11,993.95, based on operating hours the equipment was used to address the spare casting issue and the time this and other equipment remained idle until such equipment was needed to perform subsequent activities after the casting was installed. The operating and idle time was determined from the quality control reports. The operation rates and standby rates were based on the Corps' equipment manual rates. The government does not dispute the equipment rates. (Ex. A-7 at 646, 649, ex. A-19 at 71-74, 100-01)

30. The field office overhead for the 21-day delay period requested in K&K's revised claim is $28,775.02. Field office overhead includes K&K's employees responsible for the supervision of the Project based on the calendar days they spent on this Project, the burden for those management employees, and related miscellaneous expenses including vehicles, lodging, insurance, electricity, and telephone/internet. The government does not dispute the rates for the management personnel. Nor is there any persuasive evidence disputing the allowability of the total field office amount claimed. (Ex. A-7 at 646, 652, exs. A-13, -19 at 81; tr. 125-30)

31. Profit and home office overhead for the 21-day delay period requested in K&K's revised claim is $25,997.62 which was based on a percentage calculated in accordance with the Corps' profit factors and weight guidelines. The profit and overhead requested in K&K's updated revised claim is $26,898.83. The government does not dispute the profit and overhead percentage. (Ex. A-7 at 643, 646, exs. A-13, -19 at 87-88; tr. 1/130-33)

32. On March 6, 2017, the CO issued a final decision on K&K's claim, approving a monetary adjustment of $87,203.08 plus 21 additional calendar days (ex. A-1).

33. On May 31, 2017, the Board received K&K's timely filed notice of appeal dated May 30, 2017. K&K seeks an equitable adjustment under the contract of $155,847.31, plus interest. This amount differs from K&K's revised claim of $150,625.86 previously submitted to the CO on September 12, 2016, due to the removal of some field office personnel costs in the amount of $10,490.36 and the addition of K&K's consultant engineer's costs in the amount of $15,711.80 incurred

6

since the submission of K&K's revised claim. The field office overhead requested in K&K's updated revised claim is $20,095.26. Thus, the current amount in controversy is $68,644.23. K&K agrees with the additional 21-calendar day extension approved by the CO. (Ex. A-13) There is no contention by the government in this appeal that the prior payment was improper.

## DECISION

The government initially argues that, "[t]he Board should decline to exercise jurisdiction over the uncertified revisions to [K&K's] claim" under the Contract Disputes Act (CDA). This contention is meritless. Claim revisions are commonplace to reflect refinements in analysis as actual cost and pricing information becomes more available and developed. It is well settled, absent extraordinary circumstances not present here, that the Board is not deprived of jurisdiction to fully consider and decide the entire claim, including revisions to the certified amount prior to issuance of the CO decision. *E.g., Brooklyn Navy Yard Development Corp.*, ASBCA No. 33690, 91-1 BCA ¶ 23,516; *Essex Electro Engineers, Inc.*, ASBCA No. 40553, 91-2 BCA ¶ 23,712; *O'Rourke Co.*, ASBCA No. 41841, 91-3 BCA ¶ 24,286; *McDonnell Douglas Services, Inc.*, ASBCA No. 45556, 94-3 BCA ¶ 27,234. Proof of a higher amount than properly certified is also generally not precluded on appeal so long as a "new" claim is not being asserted. *E.g., Bick-Com Corp.*, ASBCA Nos. 24782, 26877, 84-1 BCA ¶ 16,957; *Space-Lok, Inc.*, ASBCA No. 29055, 84-2 BCA ¶ 17,425.

Although the government challenges appellant's quantification of the costs allocable to the east hinge work in dispute, it has failed to present substantive, persuasive evidence to rebut evidence and testimony introduced by appellant at trial. No witnesses testified on the Corps' behalf at trial and there was little, if any, cross-examination of appellant's witnesses. The Corps has provided no convincing reasons why we should not take appellant's credible and substantively unrebutted in-court evidence at face value for the most part and accord it controlling weight.

With regard to the 21-day delay claimed by appellant and found by the CO, the trial testimony establishes that the hinge work was on the critical path for that entire period and fully compensable. The government's allocation of portions of appellant's three laborers on site to work other than completion of the hinge work is purely speculative and unpersuasive on this record. Although there may have been additional work performed by some of the laborers on other activities, it involved minor tasks related to closing out the job. The critical driver of the delay was final reinstallation of the hinge. In reaching this conclusion, we have carefully examined the daily reports in addition to the unrebutted trial testimony of appellant's witnesses.

Moreover, the trial testimony and daily reports conclusively establish that the government's challenge to the $7,959 associated with the three K&K laborers is meritless.

7

The evidence presented at the hearing demonstrates that Messrs. Whiskin, Alvarez, and Leger were fully dedicated to the spare casting and east gate completion, and the Corps' reductions of those three employees' labor costs are based on speculative "guesses" and uncorroborated hearsay. The government failed to offer any persuasive rationale for its conjectural contentions by witnesses subjected to cross-examination at trial. Appellant is entitled to recover the full $7,959 in labor costs questioned by the government.

Similar considerations support full recovery of equipment costs disallowed by the government in computing the equitable adjustment. The documentary record and testimony of appellant's witnesses established that all claimed equipment was on site as of August 23, 2013, and necessary for the installation of the spare casting and east gate and/or successor activities to complete the contract. The government's reductions for standby (versus operating) time and allocations of a portion of the claimed costs for allegedly non-critical work are simply arbitrary and insufficiently proven by persuasive evidence. Consequently, K&K is entitled to recover the additional $11,994 in equipment costs claimed and disallowed by the Corps.

The CO's final decision awarded $37,600.00 for 188 consultant hours incurred in advance of October 27, 2015. The government does not dispute the rate charged by K&K's consultant. The cut-off date underlying the government's decision is incorrect. Presumptively, contractors are entitled to recover consulting fees incurred in administration of the contract, ordinarily including negotiation of REAs, before claim submission. *See, e.g., Optimum Services, Inc.*, ASBCA No. 59952, 16-1 BCA ¶ 36,490 at 177,827 (and cases cited). There is insufficient proof to establish that costs incurred between October 27, 2015 and January 7, 2016, were incurred in the prosecution of the claim. We have found that Mr. Perez actually expended a total of 236 hours in pre-claim negotiations and preparation of REAs before submission of the claim in January 2016. Accordingly, we award appellant an additional 48 hours for a total monetary increase of $9,600 in consulting expenses.

Regarding field office overhead, the government has failed to present persuasive evidence that the amount claimed should be reduced. Accordingly, appellant is entitled to recover the revised amount of $20,995 for this category of costs. Similarly, the government has not challenged the profit, home office or bonding percentages costs claimed. Nor does it dispute appellant's methodology and use of its 20.86 composite percentage for all of the latter three mark-ups. We find the above costs to be allowable and recoverable.

In summary, we find that appellant is entitled to recover additional direct labor costs ($7,959), equipment costs ($11,994), consulting costs ($9,600) and field office overhead costs ($20,995), totaling $50,548. We apply the accepted 20.86 composite mark-up percentage to derive a total award $61,092, in addition to that previously

8

awarded by the CO (*see* findings 32-33). Appellant is also entitled to interest in accordance with the CDA from the date of initial claim submission on January 13, 2016.

The appeal is sustained to the extent indicated.

Dated: September 5, 2018

_____
ROBERT T. PEACOCK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

_____
RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

_____
J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61189, Appeal of K&K Industries, Inc., rendered in conformance with the Board's Charter.

Dated:

_____
JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

9